## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRIAN LEE, derivatively on behalf of HYZON MOTORS, INC. f/k/a DECARBONIZATION PLUS ACQUISITION CORPORATION, | Case No.: |
| Plaintiff, | |
| v. | |
| ERIK ANDERSON, PETER HASKOPOULOS, CRAIG KNIGHT, MARK GORDON, JENNIFER AAKER, JANE KEARNS, PIERRE LAPEYRE, JR., DAVID LEUSCHEN, JIM MCDERMOTT, JEFFREY TEPPER, ROBERT TICHIO, MICHAEL WARREN, IVY BROWN, DENNIS EDWARDS, GEORGE GU, VIKTOR MENG, KI DEOK PARK, and ELAINE WONG | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| HYZON MOTORS, INC. f/k/a DECARBONIZATION PLUS ACQUISITION CORPORATION, | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Brian Lee ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Hyzon Motors, Inc. ("Hyzon") f/k/a Decarbonization Plus Acquisition Corporation ("DCRB," both Hyzon and DCRB referred to herein as the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Erik Anderson, Peter Haskopoulos, Craig Knight, Mark Gordon, Jennifer Aaker, Jane Kearns, Pierre Lapeyre, Jr., David Leuschen, Jim McDermott, Jeffrey Tepper, Robert Tichio, Michael Warren, Ivy Brown, Dennis

Edwards, George Gu, Viktor Meng, Ki Deok "KD" Park, and Elaine Wong (collectively, the "Individual Defendants" and with the Company, "Defendants") for breaches of their fiduciary duties as directors and/or officers of the Company, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets, against Defendants Erik Anderson, Jennifer Aaker, Jane Kearns, Pierre Lapeyre, Jr., David Leuschen, Jim McDermott, Jeffrey Tepper, Robert Tichio, and Michael Warren (collectively with Defendant Peter Haskopoulos, the "DCRB Defendants") for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), against Defendants Erik Anderson, Peter Haskopoulos, Craig Knight, and Mark Gordon for contribution under Sections 10(b) and 21D of the Exchange Act, and against Defendants Mark Gordon, George Gu, Craig Knight, and Viktor Meng (collectively the "Legacy Hyzon Defendants") for aiding and abetting the breaches of fiduciary duties of the DCRB Defendants. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Company's directors and officers from February 9, 2021 through September 27, 2021, both dates inclusive (the "Relevant Period").

2.      Hyzon is a Delaware corporation based in Honeoye Falls, New York, that develops, markets, and sells hydrogen fuel cell powered commercial vehicles.

3.      Hyzon, in its current form, came about as the result of a July 2021 merger (the "Merger") between DCRB—a publicly-traded special purpose acquisition company ("SPAC") formed for the purpose of completing a business combination with one or more target companies— and another corporation engaged in substantially the same business as Hyzon is now, also called Hyzon Motors, Inc. ("Legacy Hyzon").

4.      Beginning February 9, 2021 and until the Merger, the DCRB Defendants made, and/or caused the Company to make, false and misleading statements concerning Legacy Hyzon's and the Company's business, operations, and prospects. Specifically, the DCRB Defendants, in the leadup to the Merger with Legacy Hyzon, misrepresented agreements with several purported Legacy Hyzon customers, including touting partnerships with well-known companies which partnerships did not exist, touting deals with companies which companies did not exist, and overstating the terms of other partnerships and deals, making Legacy Hyzon and the Company appear more valuable than they were. Moreover, the DCRB Defendants misrepresented the delivery timeline for Legacy Hyzon's vehicles, indicating that deliveries could begin in 2021 when they could not. The Legacy Hyzon Defendants aided and abetted this misconduct by not causing the truth concerning Legacy Hyzon to be disclosed to the investing public, despite the Legacy Hyzon Defendants knowing the truth and knowing that the DCRB Defendants were issuing false and misleading statements concerning Legacy Hyzon. The Legacy Hyzon Defendants were motivated to do this by the financial reward they would reap if the Merger closed while DCRB's stock price, and thereafter Hyzon's stock price, was artificially inflated by these false and misleading statements.

5.     Following the Merger, Defendants Erik Anderson, Ivy Brown, Dennis Edwards, Mark Gordon, George Gu, Craig Knight, Viktor Meng, Ki Deok "KD" Park, and Elaine Wong continued to make, and/or cause Hyzon to make, false and misleading statements which misrepresented Hyzon's agreements with customers and which overstated Hyzon's anticipated delivery timeline.

6.     The Individual Defendants' collective misrepresentations had the effect of misleading the investing public and artificially inflating the Company's stock during the Relevant Period.

7.     The truth emerged on September 28, 2021 when *Blue Orca Capital* published a report (the "Blue Orca Report") that revealed, *inter alia*, the illusory and/or overstated nature of many of Hyzon's purported deals and that the Company would not be delivering vehicles in 2021 as previously claimed.

8.     On this news, the Company's share price declined by $2.58 per share—over 28%—from its February 27, 2021 closing price of $9.21 per share to close February 28, 2021 at $6.63.

9.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding Legacy Hyzon's and the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) many of the Legacy Hyzon's, and later the Company's, touted partnerships with customers were nonexistent or overstated; (2) Legacy Hyzon, and later the Company, would not be able to deliver vehicles in 2021. As a result of the foregoing, the Company's public statements concerning Legacy Hyzon's, and later the Company's, deals with customers and Legacy Hyzon's,

and later the Company's, anticipated production timelines were materially false and misleading at all relevant times.

10.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact.

11.     As to the false and misleading statements which the DCRB Defendants made, or caused DCRB to make, prior to the Merger, the Legacy Hyzon Defendants aided and abetted this breach of the DCRB Defendants' fiduciary duties by not causing the truth, which was known to them, to be disclosed.

12.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

13.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), DCRB's former CEO (and current Hyzon director), and DCRB's former CFO to a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the Western District of New York (the "Securities Class Action") and which has further subjected the Company to the need to undertake intake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

14.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

15.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, including all of Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of the liability of three of the Company's directors in the Securities Class Action, and of the directors not being disinterested and/or independent, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

17.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

19.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, Defendants' actions have had an effect in this District, and Hyzon is headquartered in this District.

## PARTIES

**Plaintiff**

20.     Plaintiff is a current shareholder of the Company. Plaintiff purchased Company common stock prior to the start of the Relevant Period and has continuously held Company common stock at all relevant times.

**Nominal Defendant Hyzon**

21.     Hyzon is a Delaware corporation with its principal executive offices at 475 Quaker Meeting House Road, Honeoye Falls, New York 14472. Hyzon's shares trade on the NASDAQ Capital Market ("NASDAQ") under the ticker symbol "HYZN." Hyzon's warrants also trade on the NASDAQ, under the ticker symbol "HYZNW." Prior to the Merger, shares of DCRB common stock traded on the NASDAQ under the ticker symbol "DCRB," while its warrants traded on the NASDAQ under the ticker symbol "DCRBW," and its units traded on the NASDAQ under the ticker symbol "DCRBU."

**Defendant Anderson**

22.     Defendant Erik Anderson ("Anderson") has been a Hyzon director since the Merger. Prior to the Merger, he was CEO of DCRB since September 2020 and a member of DCRB's board since October 2020. He serves as Chair of the Compensation Committee. According to the Company's prospectus filed with the SEC on Form 424B3 on August 10, 2021 (the "Prospectus"), as of July 16, 2021, Defendant Anderson beneficially owned 630,947 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on July 16, 2021 was $10.33, Defendant Anderson owned approximately $6.5 million worth of Hyzon stock.

23.     The Prospectus stated the following about Defendant Anderson:

***Erik Anderson***. Mr. Anderson has served as a member of the Board since July 2021. Mr. Anderson served as DCRB's Chief Executive Officer from September 2020 until July 2021 and as a member of the DCRB board of directors from October

2020 until July 2021. Mr. Anderson has served as the chief executive officer of Decarbonization Plus Acquisition Corporation III since February 11, 2021 and a member of its board of directors since March 2021. Mr. Anderson has served as the chief executive officer of Decarbonization Plus Acquisition Corporation II since January 2021 and a member of its board of directors since February 2021. Mr. Anderson founded WRG, a collaboration of leading investment firms providing integrated capital solutions to the global innovation economy, in 2002 and has served as chief executive officer of WRG since its inception. In 2018, Mr. Anderson became executive chairman of Singularity University, a company that offers executive educational programs, a business incubator and innovation consultancy service. Mr. Anderson is also the executive chairman of Topgolf Entertainment Group, a global sports and entertainment company. Mr. Anderson has received numerous honors, including the Ernst & Young Entrepreneur of the Year Award. In 2018 and 2017, Mr. Anderson was honored by Goldman Sachs as one of their Top 100 Most Intriguing Entrepreneurs. In 2019 and 2018, Mr. Anderson was ranked by Golf Inc. as the No. 3 most powerful person in the golf industry after being ranked No. 8 in 2017. Mr. Anderson is Vice-Chairman of ONEHOPE, a cause-centric consumer brand and technology company, and is the founder of America's Foundation for Chess, currently serving 160,000 children in the United States with its First Move curriculum. Mr. Anderson serves on the Board of Play Magnus, an interactive chess app. In 2019, Mr. Anderson became a member of the board of Pro.com, a leader in the home improvement experience industry. His investment experience includes being partner at Frazier Healthcare Partners, chief executive officer of Matthew G Norton Co. and vice president at Goldman, Sachs & Co. Mr. Anderson was recognized early in his career as one of the top "40 under 40" young achievers and emerging leaders by Seattle's Puget Sound Business Journal. Mr. Anderson holds a master's and bachelor's degree in Industrial Engineering from Stanford University and a bachelor's degree (Cum Laude) in Management Engineering from Claremont McKenna College.

We believe Mr. Anderson is qualified to serve on the Board due to his experience serving as DCRB's Chief Executive Officer and member of the DCRB board of directors, and his financial, investing and management expertise.

**Defendant Haskopoulos**

24.     Defendant Peter Haskopoulos ("Haskopoulos") served as DCRB's CFO, Chief Accounting Officer, and Secretary from August 2020 until the Merger.

25.     The proxy statement filed by DCRB on schedule 14A with the SEC on June 21, 2021 (the "2021 Proxy Statement"), stated the following about Defendant Haskopoulos:

*Peter Haskopoulos* has served as our Chief Financial Officer, Chief Accounting Officer and Secretary since August 2020. Mr. Haskopoulos has served as the chief

financial officer, chief accounting officer and secretary of Decarbonization Plus Acquisition Corporation III since February 2021. Mr. Haskopoulous has served as the chief financial officer, chief accounting officer and secretary of Decarbonization Plus Acquisition Corporation II since December 2020. Mr. Haskopoulos is a managing director of Riverstone and serves as Riverstone's chief financial officer. Prior to joining Riverstone in 2007, Mr. Haskopoulos served in several financial roles within Thomson Reuters Corporation (NYSE: TRI), most recently as the director of finance. Previously, he was a manager with Ernst & Young, where he worked with both public and private companies. Mr. Haskopoulos started his career at Arthur Andersen. Mr. Haskopoulos earned his M.B.A. and undergraduate degree from Rutgers University and is a certified public accountant.

**Defendant Knight**

26.     Defendant Craig Knight ("Knight") has served as a director and the CEO of Hyzon since the Merger. Prior to the Merger, he was CEO and a member of the board of Legacy Hyzon since August 2020; prior to that, he was Legacy Hyzon's Chief Commercial Officer since he and, *inter alia*, Defendant George Gu ("Gu") cofounded Legacy Hyzon in January 2020. According to the Prospectus, Defendant Knight beneficially owned 5,714,700 shares of Company common stock as of July 16, 2021, representing 2.3% of the Company's outstanding common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on July 16, 2021 was $10.33, Defendant Knight owned approximately $59 million worth of Company stock.

27.     Defendant Knight also owns, according to the Prospectus, 2.4% of the Company's majority shareholder, Horizon Fuel Cell Technologies Pte. Ltd. ("Horizon"), which itself beneficially owned 155,639,006 shares of the Company's common stock, or 63% of the Company's outstanding common stock, as of July 16, 2021.

28.     The Prospectus stated the following about Defendant Knight:

*Craig Knight*. Mr. Knight has served as Hyzon's Chief Executive Officer and as a member of the Board since August 2020. From January 2020 when Mr. Knight co-founded Hyzon until August 2020, Mr. Knight served as its Chief Commercial Officer. Mr. Knight served as Chief Executive Officer of Horizon from September

2019 to August 2020, and as Horizon's Chief Executive Officer from August 2006 to September 2019. Mr. Knight has been the Managing Director of Hymas, an affiliate of Hyzon, since its formation in May 2018. Mr. Knight holds an M.B.A. and a B.S. degree in Chemistry and Pure Mathematics from the University of Sydney.

We believe Mr. Knight is qualified to serve on the Board due to his operational experience as Hyzon's Chief Executive Officer and a member of Old Hyzon's board of directors, his historical knowledge of Hyzon and its strategic objectives as one of its co-founders, and extensive business leadership and professional experience in the hydrogen mobility and chemical sectors.

**Defendant Gordon**

29.     Defendant Mark Gordon ("Gordon") has served as a Company director and as CFO since the Merger. Prior to the Merger, he was CFO of Legacy Hyzon since August 2020.

30.     The Prospectus stated the following about Defendant Gordon:

***Mark Gordon.*** Mr. Gordon has served as Chief Financial Officer of Hyzon since August 2020 and as a member of the Board since July, 2021. Mr. Gordon served as the Chief Investment Officer of Ascent Fund, an energy transition investment platform, since January 2018. From January 2018 to October 2015 Mr. Gordon served as a senior portfolio manager at Janus Henderson, a leading global active asset manager, and its predecessor, where he managed the Alphagen Energy Funds. From December 2012 to December 2014, Mr. Gordon worked as a senior analyst at Paulson & Co, Inc., an investment management firm, where he was responsible for the energy sector. Prior to his tenure at Paulson, Mr. Gordon was a portfolio manager at Soros Fund Management, an investment management firm, from April 2009 to March 2012, where he ran an energy and natural resources fund. Mr. Gordon was a Managing Director of Goldman Sachs Asset Management from December 2007 to January 2009, and previously worked as a portfolio manager from September 2004 to January 2009. Prior to that, he worked as a research analyst from September 2000 to August 2004. Mr. Gordon holds an M.B.A. (honors) from the University of Chicago with concentrations in Analytic Finance and Economics, an M.A. degree from Stanford University and a B.A. degree from Brown University (honors). Mr. Gordon is a CFA charter holder.

We believe Mr. Gordon is qualified to serve on the Board due to his operational experience as Hyzon's Chief Financial Officer, his historical knowledge of Hyzon and his extensive business and financial experience at various investment and asset management firms, particularly in the energy transition industry.

**Defendant Aaker**

31.     Defendant Jennifer Aaker ("Aaker") served as a DCRB director from October 2020 until the Merger. According to the 2021 Proxy Statement, Defendant Aaker was estimated to beneficially own 22,130 shares the Company common stock after the closing of the Merger,[1] which occurred on July 16, 2021. Given that the price per share of the Company's common stock at the close of trading on July 16, 2021 was $10.33, Defendant Aaker owned approximately $229,000 worth of Company stock.

32.     The 2021 Proxy Statement stated the following about Defendant Aaker:

**Dr. Jennifer Aaker** has served as a member of the DCRB Board since October 22, 2020. Dr. Aaker has served as a member of the board of directors of Decarbonization Plus Acquisition Corporation II since February 2021. Dr. Aaker has been the General Atlantic Professor at Stanford Graduate School of Business since 2001 and serves as the Coulter Family Faculty Fellow at Stanford Graduate School of Business. A behavioral scientist and author, Dr. Aaker is widely published in leading scientific journals and her work has been featured in The Economist, The New York Times, The Wall Street Journal, The Washington Post, BusinessWeek, Forbes, NPR, CBS MoneyWatch, Inc., and Science. Dr. Aaker is the coauthor of several books including the award-winning book, The Dragonfly Effect, which has been translated into over ten languages, as well as Power of Story, which drew on behavioral science to provide a hands-on tool putting The Dragonfly Effect model to work. Her professional areas of focus include artificial intelligence, digitization and brand value. Dr. Aaker currently serves on the board of directors of Codexis Inc. and on the board of directors and audit committee of the Stephen and Ayesha Curry Eat. Learn. Play. Foundation. Ms. Aaker served on the boards of Corporate Visions, Inc. from 2011 to 2016, California Casualty Insurance from 2009 to 2015, and Accompany from 2014 to 2018. She is the recipient of the Distinguished Scientific Achievement Award, Stanford Distinguished Teaching Award, Citibank Best Teacher Award, George Robbins Best Teacher Award, Robert Jaedicke Silver Apple Award, and the MBA Professor of the Year Award. Dr. Aaker completed her PhD degrees at Stanford University, and holds a BA from UC Berkeley.

We believe that Dr. Aaker's expertise in behavioral science, artificial intelligence, digitization and brand value and significant experience on numerous boards of directors bring important and valuable skills to our board of directors.

---

[1] The 2021 Proxy Statement was filed before the Merger closed. Therefore, the numbers it includes for post-Merger beneficial ownership are estimates.

**Defendant Kearns**

33.     Defendant Jane Kearns ("Kearns") served as a DCRB director from October 2020 until the Merger. According to the 2021 Proxy Statement, Defendant Kearns was estimated to beneficially own 22,130 shares the Company common stock after the closing of the Merger, which occurred on July 16, 2021. Given that the price per share of the Company's common stock at the close of trading on July 16, 2021 was $10.33, Defendant Kearns owned approximately $229,000 worth of Company stock.

34.     The 2021 Proxy Statement stated the following about Defendant Kearns:

*Jane Kearns* has served as a member of the DCRB Board since October 22, 2020. Ms. Kearns has served as a member of the board of directors of Decarbonization Plus Acquisition Corporation II since February 2021. Ms. Kearns is Vice President, Growth Services (since May 2019), and Senior Advisor, Cleantech (since October 2012), at MaRS Discovery District. MaRS is a launchpad for startups, a platform for researchers and a home to innovators, supporting over 1,200 Canadian science and technology companies tackling society's greatest challenges in four core categories: cleantech, health, fintech and enterprise software. Ms. Kearns co-founded, grew and profitably sold a renewable energy company, and leverages over 20 years of experience in venture capital, cleantech and sustainability to help build businesses that matter. Ms. Kearns is a co-founder of the CanadaCleantech Alliance, sits on the board of Clear Blue Technologies International (TSXV: CBLU), is an advisory board member for StandUp Ventures and Amplify Ventures, and is a member of the Expert Panel on Clean Growth for the Canadian Institute for Climate Choices. She holds an MBA from Columbia University.

We believe that Ms. Kearns's leadership in sustainable innovation and extensive experience growing successful companies at the intersection of business and sustainability bring important and valuable skills to our board of directors.

**Defendant Lapeyre**

35.     Defendant Pierre Lapeyre, Jr. ("Lapeyre") served as a DCRB director from October 2020 until the Merger. According to the 2021 Proxy Statement, Defendant Lapeyre was estimated to beneficially own 4,591,708 shares the Company common stock, representing between 1.8%–2% of the Company's outstanding common stock depending on redemption of public shares of

DCRB, after the closing of the Merger. These shares were held by the SPAC sponsor,

Decarbonization Plus Acquisition Sponsor LLC (the "Sponsor"), which Defendant Lapeyre had

shared voting and investment discretion over as a cofounder and senior managing director of

Riverstone Holdings, LLC ("Riverstone"), of which Sponsor is an affiliate. Given that the price

per share of the Company's common stock at the close of trading on July 16, 2021 was $10.33,

Defendant Lapeyre beneficially owned approximately $47.4 million worth of Company stock.

36.     The 2021 Proxy Statement stated the following about Defendant Lapeyre:

*Pierre Lapeyre, Jr.* has served as a member of the DCRB Board since October 22,
2020. Mr. Lapeyre has served as a member of the board of directors of
Decarbonization Plus Acquisition Corporation II since February 2021. Mr. Lapeyre
is the co-founder and senior managing director of Riverstone Holdings LLC.
Mr. Lapeyre was a managing director of Goldman Sachs in its Global Energy &
Power Group. Mr. Lapeyre joined Goldman Sachs in 1986 and spent his 14-year
investment banking career focused on energy and power, and leading client
coverage and execution of a wide variety of M&A, IPO, strategic advisory and
capital markets financings for clients across all sectors of the industry. Mr. Lapeyre
received his B.S. in Finance/Economics from the University of Kentucky and his
M.B.A. from the University of North Carolina at Chapel Hill. Mr. Lapeyre serves
on the boards of directors or equivalent bodies of a number of public and private
Riverstone portfolio companies and their affiliates. In addition to his duties at
Riverstone, Mr. Lapeyre serves on the Executive Committee of the Board of
Visitors of the MD Anderson Cancer Center and is a Trustee and Treasurer of The
Convent of the Sacred Heart.

We believe that Mr. Lapeyre's considerable energy and power private equity and
investment banking experience bring important and valuable skills to our board of
directors.

**Defendant Leuschen**

37.     Defendant David Leuschen ("Leuschen") served as a DCRB director from October

2020 until the Merger. According to the 2021 Proxy Statement, Defendant Leuschen was estimated

to beneficially own 4,591,708 shares the Company common stock, representing between 1.8%–

2% of the Company's outstanding common stock depending on redemption of public shares of

DCRB, after the closing of the Merger. These shares were held by Sponsor, which Defendant

Leuschen had shared voting and investment discretion over as a cofounder and senior managing director of Riverstone, of which Sponsor is an affiliate. Given that the price per share of the Company's common stock at the close of trading on July 16, 2021 was $10.33, Defendant Leuschen beneficially owned approximately $47.4 million worth of Company stock.

38.     The 2021 Proxy Statement stated the following about Defendant Leuschen:

**David Leuschen** has served as a member of the DCRB Board since October 22, 2020. Mr. Leuschen has served as a member of the board of directors of Decarbonization Plus Acquisition Corporation II since February 2021. Mr. Leuschen is the co-founder and senior managing director of Riverstone Holdings LLC. Prior to Riverstone, Mr. Leuschen was a partner and managing director at Goldman Sachs and founder and head of the Goldman Sachs Global Energy and Power Group. Mr. Leuschen was responsible for building the Goldman Sachs energy and power investment banking practice into one of the leading franchises in the global energy and power industry. Mr. Leuschen additionally served as chairman of the Goldman Sachs Energy Investment Committee, where he was responsible for screening potential direct investments by Goldman Sachs in the energy and power industry. In addition to his board roles at various Riverstone portfolio companies and investment vehicles, Mr. Leuschen has served as a director of Cambridge Energy Research Associates, Cross Timbers Oil Company (predecessor to XTO Energy) and J. Aron Resources. He is also president and sole owner of Switchback Ranch LLC and on the Advisory Board of Big Sky Investment Holdings LLC. David serves on a number of nonprofit boards of directors, including as a Trustee of United States Olympic Committee Foundation, a Director of Conservation International, a Director of the Peterson Institute for International Economics, a Founding Member of the Peterson Institute's Economic Leadership Council, a Director of the Wyoming Stock Growers Association and a Director of the Montana Land Reliance. Mr. Leuschen received his A.B. from Dartmouth and his M.B.A. from Dartmouth's Amos Tuck School of Business.

We believe that Mr. Leuschen's considerable energy and power private equity and investment banking experience, as well as his experience on the boards of various Riverstone portfolio companies and investment vehicles, bring important and valuable skills to our board of directors.

**Defendant McDermott**

39.     Defendant Jim McDermott ("McDermott") served as a DCRB director from October 2020 until the Merger. According to the 2021 Proxy Statement, Defendant McDermott was estimated to beneficially own 331,950 shares the Company common stock after the closing of

the Merger, which occurred on July 16, 2021. Given that the price per share of the Company's

common stock at the close of trading on July 16, 2021 was $10.33, Defendant McDermott owned

approximately $3.4 worth of Company stock.

40.    The 2021 Proxy Statement stated the following about Defendant McDermott:

***Jim McDermott*** has served as the lead independent director of the DCRB Board
since October 22, 2020. Mr. McDermott has served as a member of the board of
directors of Decarbonization Plus Acquisition Corporation II since February 2021.
Mr. McDermott is the founder and chief executive officer of Rusheen Capital
Management, a private equity firm that invests in growth-stage companies in the
carbon capture and utilization, low-carbon energy and water sustainability sectors.
As an investor and entrepreneur, Mr. McDermott has founded, run and invested in
over 35 businesses over a 25 year career and has built an extensive professional
network in the low-carbon energy, water and sustainability sectors. From 1996 to
2003, Mr. McDermott founded and ran Stamps.com (STMP:NASDAQ),
Archive.com (sold to Cyclone Commerce) and Spoke.com. From 2003 to 2017,
Mr. McDermott co-founded and served as Managing Partner of US Renewables
Group, a private investment firm, where he raised and invested approximately
$1 billion into clean energy businesses. Mr. McDermott was founder and board
member of NanoH2O, is the founder and executive chairman of Fulcrum
BioEnergy, investor and board observer of Moleaer, a board member of Carbon
Engineering and the chief executive officer of 1PointFive. For five years,
Mr. McDermott has been a board member of the Los Angeles Cleantech Incubator.
Mr. McDermott holds a MBA from UCLA, and a BA in Philosophy from Colorado
College.

We believe Mr. McDermott's extensive investment and leadership experience
brings important and valuable skills to our board of directors.

**Defendant Tepper**

41.    Defendant Jeffrey Tepper ("Tepper") served as a DCRB director from October

2020 until the Merger. According to the 2021 Proxy Statement, Defendant Tepper was estimated

to beneficially own 22,130 shares the Company common stock after the closing of the Merger,

which occurred on July 16, 2021. Given that the price per share of the Company's common stock

at the close of trading on July 16, 2021 was $10.33, Defendant Tepper owned approximately

$229,000 worth of Company stock.

42.     The 2021 Proxy Statement stated the following about Defendant Tepper:

***Jeffrey Tepper*** has served as a member of the DCRB Board since October 22, 2020. Mr. Tepper has served as a member of the board of directors of Decarbonization Plus Acquisition Corporation II since February 2021. Mr. Tepper is founder of JHT Advisors LLC, a mergers and acquisitions ("M&A") advisory and investment firm. From 1990 to 2013, Mr. Tepper served in a variety of senior management and operating roles at the investment bank Gleacher & Company, Inc. and its predecessors and affiliates ("Gleacher"). Mr. Tepper was head of investment banking and a member of Gleacher's Management Committee. Mr. Tepper is also Gleacher's former chief operating officer overseeing operations, compliance, technology and financial reporting. In 2001, Mr. Tepper co-founded Gleacher's asset management activities and served as president. Gleacher managed over $1 billion of institutional capital in the mezzanine capital and hedge fund areas. Mr. Tepper served on the investment committees of Gleacher Mezzanine and Gleacher Fund Advisors. Between 1987 and 1990, Mr. Tepper was employed by Morgan Stanley & Co. as a financial analyst in the M&A and merchant banking departments. Mr. Tepper served as a director of Silver Run I from its inception in November 2015 until the completion of its acquisition of Centennial in October 2016 and has served as a director of Centennial Resource Development, Inc. (NASDAQ: CDEV) since October 2016. Mr. Tepper is a former director of Alta Mesa Resources, Inc. (NASDAQ: AMR) and its predecessor, Silver Run II, between March 2017 and June 2020. Mr. Tepper received a Master of Business Administration from Columbia Business School and a Bachelor of Science in Economics from The Wharton School of the University of Pennsylvania with concentrations in finance and accounting.

We believe Mr. Tepper's extensive M&A experience, including service on the boards of directors of two blank check companies, brings important and valuable skills to our board of directors.

**Defendant Tichio**

43.     Defendant Robert Tichio ("Tichio") served as a DCRB director from August 2020 until the Merger.

44.     The 2021 Proxy Statement stated the following about Defendant Tichio:

***Robert Tichio*** has served as a member of the DCRB Board since August 2020 and served as our chief executive until September 2020. Mr. Tichio has served as a member of the board of directors of Decarbonization Plus Acquisition Corporation III since February 2021 and temporarily served as its chief executive officer in February 2021. Mr. Tichio has served as a member of the board of directors of Decarbonization Plus Acquisition Corporation II since December 2020 and served as its chief executive officer from December 2020 to January 2021. Mr. Tichio is a

partner and managing director of Riverstone Holdings LLC. Mr. Tichio joined the firm in 2006 and has been focused on the firm's Private Equity business. Prior to joining Riverstone, Mr. Tichio was in the Principal Investment Area (PIA) of Goldman Sachs, which manages the firm's private corporate equity investments. Mr. Tichio began his career at J.P. Morgan in the Mergers & Acquisition Group, where he concentrated on assignments that included public company combinations, asset sales, takeover defenses, and leveraged buyouts. Mr. Tichio received his A.B. from Dartmouth College as a Phi Beta Kappa graduate, and later received his M.B.A. with Distinction from Harvard Business School. Mr. Tichio serves on a number of nonprofit and Riverstone portfolio company boards.

We believe that Mr. Tichio's considerable investment experience, as well as his experience on the boards of Riverstone portfolio companies, bring important and valuable skills to our board of directors.

### Defendant Warren

45.     Defendant Michael Warren ("Warren") served as a DCRB director from November 2020 until the Merger. According to the 2021 Proxy Statement, Defendant Warren was estimated to beneficially own 22,130 shares the Company common stock after the closing of the Merger, which occurred on July 16, 2021. Given that the price per share of the Company's common stock at the close of trading on July 16, 2021 was $10.33, Defendant Warren owned approximately $229,000 worth of Company stock.

46.     The 2021 Proxy Statement stated the following about Defendant Warren:

*Michael Warren* has served as a member of the DCRB Board since November 18, 2020. Mr. Warren has served as a member of the board of directors of Decarbonization Plus Acquisition Corporation II since February 2021. Mr. Warren is the Managing Director of Albright Stonebridge Group ("ASG"). Mr. Warren served as ASG's Managing Principal from 2013 to 2017 and as Principal from 2009 to 2013. Prior to ASG, Mr. Warren served as the Chief Operating Officer and Chief Financial Officer of Stonebridge International from 2004 to 2009, where he managed operations, business development, finance, and personnel portfolios. Mr. Warren served in various capacities in the Obama Administration, including as senior advisor in the White House Presidential Personnel Office and as co-lead for the Treasury and Federal Reserve agency review teams of the Obama-Biden Presidential Transition. Mr. Warren serves on the board of Brookfield Property Partners, the Board of Trustees and the risk & audit committees at Commonfund, the Board of Directors of Walker & Dunlop, Inc, and the Board of Directors of MAXIMUS. He serves as a Trustee of Yale University and is a member of the Yale

Corporation Investment Committee. Mr. Warren formerly served as a Trustee of the District of Columbia Retirement Board and as a member of the Board of Directors of the United States Overseas Private Investment Corporation. Mr. Warren received degrees from Yale University and Oxford University where he was a Rhodes Scholar.

We believe Mr. Warren is well qualified to serve as a director due to his familiarity with strategic planning, investment, financial expertise, operations and government programs gained through his service on other boards, his current and prior positions in private industry and government.

### Defendant Brown

47.     Defendant Ivy Brown ("Brown") has served as a Company director since the Merger. She is also Chair of the Audit Committee.

48.     The Prospectus stated the following about Defendant Brown:

*Ivy Brown*. Ms. Ivy Brown has served as a member of the Board since July 2021. Ms. Brown was the President of United Parcel Service Northeast from April 2013 to January 2020. Ms. Brown's career at UPS spanned 32 years, including positions as Package Division Manager from July 2006 to April 2013 and Director of Sales from August 2000 to July 2006. She has been a member of the board of directors of The Chef's Warehouse (NASDAQ: CHEF), a specialty foods distributor, since November 2020. Ms. Brown holds an M.B.A. (Information Technology) from Golden Gate University and a B.A. degree (Industrial Engineering) from Southern Illinois University.

We believe Ms. Brown is qualified to serve on the Board based on her extensive executive and professional experience in the transportation and logistics industries and experience as a director of a public company.

### Defendant Edwards

49.     Defendant Dennis Edwards ("Edwards") has served as a Company director since the Merger. He also serves as a member of both the Compensation Committee and the Nominating and Corporate Governance Committee. According to the Prospectus, as of July 16, 2021, Defendant Edwards beneficially owned 177,200 shares of the Company's common stock. Given that the price per share of the Company's common stock was $10.33 on July 16, 2021, Defendant Edwards owned approximately $1.8 million worth of Company common stock.

50.     The Prospectus stated the following about Defendant Edwards:

***Dennis Edwards***. Mr. Edwards has served as a member of the Board since July 2021. Mr. Edwards has been the President of Detroit Chassis, an assembler of rolling strip chassis, since November 2017 and has deep leadership experience overseeing global operations, program and launch management for major auto suppliers such as Lear Corporation, Advanced Engineered Products and Dura Automotive Regional plant responsibilities throughout Southeast Asia at Lear. From September 2015 to October 2017, Mr. Edwards served as Vice President of Program Management and Process Engineering at Dura Automotive Systems LLC, an automotive supplier. Prior to that, Mr. Edwards served as Vice President of Operations of Advanced Engineered Products from May 2013 to August 2015, and as Vice President of Operations of Lear Corporation from 1996 to 2012. Mr. Edwards holds an M.B.A. (Management) from Georgia State University and a B.A. degree from Oregon State University.

We believe Mr. Edwards is qualified to serve on the Board due to his extensive executive and senior management experience in the automotive industry, and his proficiencies in lean manufacturing, process engineering, capital/tooling acquisition, manufacturing, supply chain management and plant management.

### **Defendant Gu**

51.     Defendant Gu has served as Executive Chairman of the Board since the Merger. He also served as Executive Chairman at Legacy Hyzon from August 2020 until the Merger. From January 2020, when he cofounded the Legacy Hyzon along with, *inter alia*, Defendant Knight, until August 2020, he served as CEO of Legacy Hyzon. According to the Prospectus, as of July 16, 2021, Defendant Gu beneficially owned 5,759,000 shares of the Company's common stock, representing 2.3% of the Company's outstanding common stock as of that date. Given that the price per share of the Company's common stock was $10.33 on July 16, 2021, Defendant Gu owned approximately $59.5 million worth of Company common stock.

52.     Defendant Gu also owns, according to the Prospectus, 17.6% of the Company's majority shareholder, Horizon—a company Defendant Gu cofounded, serves as Chairman of, and previously served as CEO of—which itself beneficially owned 155,639,006 shares of the

Company's common stock, or 63% of the Company's outstanding common stock, as of July 16, 2021.

53.     The Prospectus stated the following about Defendant Gu:

**George Gu**. Mr. Gu has served as Executive Chairman and a member of the Board since August 2020. Prior to that, Mr. Gu served as Chief Executive Officer of Hyzon from January 2020, when he co-founded the company, until August 2020. Mr. Gu co-founded Horizon, a leading international fuel cell producer, in 2003 and has served as Horizon's Chairman since August 2019. Prior to that, Mr. Gu served as Horizon's Chief Executive Officer from the company's formation until August 2019. Mr. Gu served as the Chairman of Horizon Educational Group, an affiliate of Horizon focused on fuel cell education, from August 2019 to February 2021. From June 1999 to October 2003, Mr. Gu was the Digital Ventures Manager at Eastman Chemical Company, a specialty materials company primarily in the chemical industry, where he was responsible for clean technology and e-commerce. Mr. Gu holds an M.B.A. from the University of North Carolina (Chapel Hill) and a B.S. degree in Finance from Fudan University.

We believe Mr. Gu is qualified to serve on the Board due to his operational experience as Hyzon's Executive Chairman and as a member of Old Hyzon's board of directors, his historical knowledge of Hyzon and its strategic objectives as one of its co-founders, business leadership experience in the hydrogen mobility sector and his experience serving on the board of directors of a hydrogen-focused company.

**Defendant Meng**

54.     Defendant Viktor Meng ("Meng") has served as a Company director since the Merger. Prior to the Merger, Defendant Meng served as a director at Legacy Hyzon since August 2020. Currently, he also serves as a member of the Compensation Committee and the Nominating and Governance Committee. According to the Prospectus, as of July 16, 2021, Defendant Meng beneficially owned 44,300 shares of the Company's common stock. Given that the price per share of the Company's common stock was $10.33 on July 16, 2021, Defendant Meng owned approximately $458,000 worth of Company common stock.

55.     The Prospectus stated the following about Defendant Meng:

*Viktor Meng*. Mr. Meng has served as a member of the Board since August 2020. Mr. Meng has served as the Managing Director of Bscope Ltd., part of the Piëch-Nordhoff family office, which is focused on the management and execution of the long term strategic and sustainability interests of the Piëch-Nordhoff family, since March 2012 and Bscope Pte Ltd since 2017. One of the family office's investment vehicles holds shares in Horizon Fuel Cell Technologies Pte. Ltd. Prior to co-founding Bscope, Mr. Meng prepared the entry of Porsche Holding GmbH, Europe's largest automobile distribution and retailing company at the time, into the rapidly growing Chinese market as an independent consultant from 2002 to 2003. Mr. Meng worked as a Consultant at Haarmann Hemmelrath in Shanghai from 2001 to 2002 and at United Management Technologies in New York and London from 1999 to 2001, advising on corporate efficiency and alignment. Mr. Meng holds a B.S. *summa cum laude* in Business Administration from the State University of New York at Stony Brook and an MSc. in Management from the London School of Economics.

We believe Mr. Meng is qualified to serve on the Board due to his expertise gained from serving as a member of Old Hyzon's board of directors, and his nearly two decades of experience in global direct and venture investment.

### **Defendant Park**

56.     Defendant Ki Deok "KD" Park ("Park") has served as a Company director since

the Merger. He also serves as a member of the Audit Committee.

57.     The Prospectus stated the following about Defendant Park:

*Ki Deok (KD) Park*. Mr. Park has served as a member of the Board since July 2021. Mr. Park has served as an Executive Managing Director of Korea Zinc Co., Ltd. since January 2020 and has over 28 years of experience with the company in strategy and planning. From January 2015 to December 2019, Mr. Park served as Managing Director of Strategies and Planning, after he served as Director for the same division from 2011 to 2014. Prior to that, Mr. Park was the Chief Financial Officer of Sun Metals Corporation Pty Ltd (Korea Zinc Australian Operations) from 2008 to 2010 and a member of the board of directors of Sun Metals Holding Ltd (Korea Zin Australian Holding Company) from 2006 to 2010. Mr. Park holds a B.A. in Economics from Busan National University in Korea.

We believe Mr. Park is qualified to serve on the Board based on his experience as an executive of a publicly traded company and because of his knowledge of strategy development in the non-ferrous metal industry, for use in steel, automobiles, electronics and construction materials.

**Defendant Wong**

58.     Defendant Elaine Wong ("Wong") has served as a Company director since the Merger. She also serves as Lead Independent Director, as a member of the Audit Committee, and as Chair of the Nominating and Corporate Governance Committee. According to the Prospectus, as of July 16, 2021, Defendant Wong beneficially owned 781,386 shares of the Company's common stock. Given that the price per share of the Company's common stock was $10.33 on July 16, 2021, Defendant Wong owned approximately $8.1 million worth of Company common stock.

59.     The Prospectus stated the following about Defendant Wong:

*Elaine Wong*. Ms. Wong has served as a member of the Board since July 2021 and is the Lead Independent Director. Ms. Wong is the co-founder and a partner of Hydrogen Capital Partners, which was formed in October 2019 to support the new hydrogen energy economy's rapid growth, in which hydrogen is used as an emission free new energy source or fuel. Prior to co-founding Hydrogen Capital Partners, Ms. Wong co-founded HAO Capital in June 2006, a China-focused Growth Equity Fund that invests in healthcare, environmental technologies, FinTech and consumer companies. Ms. Wong worked at The Carlyle Group as an Associate in Washington, DC from July 1999 to August 2001 and as a Senior Associate in Hong Kong from June 2003 to June 2006. Prior to that, from August 1997 to July 1999, Ms. Wong worked as an Analyst at Arthur D. Little's chemicals practice in Cambridge, MA. Ms. Wong holds an M.B.A. from Stanford Graduate School of Business and a B.S. (Chemical Engineering) from MIT.

We believe Ms. Wong is qualified to serve on the Board due to her over 20 years' business experience in the private equity sector, her knowledge of the hydrogen energy economy and her experience serving on the boards of numerous companies that have gone on to become publicly listed companies.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

60.     By reason of their positions as officers, directors, and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants

were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally.

61.     Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

62.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

63.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

64.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of the Company's Board at all relevant times.

65.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

66.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties the officers, and directors of the Company were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, New York, and the United States, and pursuant to Hyzon's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of the Company and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that the Company's operations would comply with all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

67.     Each of the Individual Defendants further owed to the Company and its shareholders the duty of loyalty requiring that each favor the Company's interest and that of its

shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

68.     At all times relevant hereto, the Individual Defendants were the agents of each other and/or the Company and were at all times acting within the course and scope of such agency.

69.     Because of their advisory, executive, managerial, directorial, and controlling positions with the Company, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

70.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

71.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

72.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Legacy Hyzon's and the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

73. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Hyzon was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

74. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

75. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and/or of the Company, and was at all times acting within the course and scope of such agency.

## HYZON'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

### Hyzon's Code of Conduct

76. The Code of Conduct, in its "General Statement of Policy" notes that Hyzon "is committed to promoting high standards of honest and ethical business conduct and compliance with laws, rules and regulations that are applicable to its business." Moreover it states that "this Code [was adopted] to set expectations and provide guidance applicable to all Hyzon employees, independent contractors, officers and directors (collectively 'Service Providers')."

77.     The Code of Conduct further states that all Hyzon Service Providers, as the Code

of Conduct defines the term, must "adhere to the following principles:"

> ● Honesty and candor in our activities, including observance of the spirit, as well
> as the letter of the law;
>
> ● Avoidance of conflicts between personal interests and the interests of Hyzon, or
> even the appearance of such conflicts;
>
> ● Avoidance of solicitations of contributions to any charity or for any political
> candidate from any person or entity that does business or seeks to do business with
> us;
> ● Compliance with generally accepted accounting principles and controls;
>
> ● Maintenance of our reputation and avoidance of activities which might reflect
> adversely on Hyzon; and
>
> ● Integrity in dealing with the Hyzon's assets.

78.     The Code of Conduct further states: "We expect all of our directors, executives,

managers and other supervisory personnel to act with honesty and integrity, use due care and

diligence in performing responsibilities to Hyzon to help maintain a sense of commitment to this

Code among all our Service Providers, and foster a culture of fairness, honesty and accountability

within Hyzon."

79.     Moreover, regarding "Legal Compliance," the Code of Conduct states that "[i]t is

essential that you know and understand the legal and regulatory requirements that apply to our

business and to your specific area of responsibility or work" and that "[y]ou must always obey the

law while performing your work for Hyzon."

80.     With regard to "Conflicts of Interest," the Code of Conduct provides: "We expect

our Service Providers to avoid actual or apparent conflicts of interest with Hyzon." Among the

factors the Code of Conduct advises Hyzon Service Providers to consider are "whether you or

[another] Service Provider has access to confidential Company information or influence over

28

significant Company resources or decisions;" as well as "the extent to which the activity could

benefit the Service Provider or a family member of the Service Provider, directly or indirectly[.]"

81.     In addition, the Code of Conduct states that, "[t]o help ensure the integrity of our

records and public disclosure, we require that:"

- transactions be supported by appropriate documentation;
- the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in our books and records;

- Service Providers comply with our system of internal controls and be held accountable for their entries[.]

82.     The Code of Conduct continues that:

- no Service Provider may take or authorize any action that would cause Hyzon's financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

- all Service Providers must cooperate fully with Hyzon's finance department, as well as its independent auditors and legal counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that Hyzon's books and records, as well as its reports filed with the SEC, are accurate and complete; and

- no Service Provider should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of Hyzon's reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of such reports accurate in all material respects.

83.     Moreover, the Code of Conduct placed additional responsibilities on directors,

noting that "[i]n connection with the preparation of the financial and other disclosures that we

make to the public . . . directors must, in addition to complying with all applicable laws, rules and

regulations, follow these guidelines:"

- act honestly, ethically and with integrity;

- comply with this Code;

- endeavor to ensure complete, fair, accurate, timely and understandable disclosure in our filings with the SEC;

- raise questions and concerns regarding our public disclosures when necessary and ensure that such questions and concerns are appropriately addressed;

- act in good faith in accordance with the director's business judgment, without misrepresenting material facts or allowing independent judgment to be subordinated by others; and

- comply with our disclosure controls and procedures and internal controls over financial reporting.

84.    Further, the Code of Conduct required the CEO, CFO, and other "Senior Financial Employees" to:

- act with honesty and integrity and use due care and diligence in performing his or her responsibilities to Hyzon;

- avoid situations that represent actual or apparent conflicts of interest with his or her responsibilities to Hyzon, and disclose promptly to the Nominating and Governance Committee any transaction or personal or professional relationship that reasonably could be expected to give rise to such an actual or apparent conflict. . . .

*                *                *

- provide constituents with information that is accurate, complete, objective, relevant, timely and understandable, including information for inclusion in our submissions to governmental agencies or in public statements;

- comply with applicable laws, rules and regulations of federal, state and local governments, and of any applicable public or private regulatory and listing authorities; and

- achieve responsible use of and control over all assets and resources entrusted to each Senior Financial Employee.

85.    Finally, the Code of Conduct provided that: "If you are aware of a suspected or actual violation of this Code by others, it is your responsibility to report it. Failure to report such events constitute a violation of this Code."

*Audit Committee Charter*

86.     The Company's Audit Committee Charters states that two of the Audit Committee's purposes are to assist Board oversight "of "the integrity of the Company's financial statements" and "the Company's compliance with legal and regulatory requirements[.]"

87.     Among the Audit Committee's duties and responsibilities, the Audit Committee Charter lists:

> (iii)    to discuss with the Company's General Counsel any significant legal, compliance or regulatory matters that may have a material effect on the financial statements or the Company's business, financial statements or compliance policies, including material notices to or inquiries received from governmental agencies;
>
> (iv)    to discuss and review the type and presentation of information to be included in earnings press releases and other public announcements regarding material developments;
>
> (v)     to discuss the Company's earnings and related press releases, as well as financial information and earnings guidance provided to analysts and ratings agencies, which discussion may be done generally (i.e., a discussion of the types of information to be disclosed and the type of presentation to be made) and which discussion need not be conducted in advance of the earnings release or other instance in which the Company may provide earnings guidance;
>
> (vi)    to review the adequacy of the internal control policies and procedures[.]
>
> *                    *                    *
>
> (viii) to inquire of the Company's chief executive officer and chief financial officer as to the existence of any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information and as to the existence of any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting; [and]
>
> (ix) to discuss guidelines and policies governing the process by which senior management of the Company and the relevant departments of the Company assess and manage the Company's exposure to risk, and to discuss the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures[.]

88.     Defendants Gu, Knight, Gordon, Anderson, Brown, Edwards, Meng, Park, and Wong violated the Code of Conduct, Company policy, and the Company's corporate governance documents by engaging in or permitting the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, aiding and abetting breaches of fiduciary duty, waste of corporate assets, unjust enrichment, abuse of control, gross mismanagement, and violations of the Exchange Act. Further in violation of the Code of Conduct and the Company's policies, the Individual Defendants failed to act with honesty and integrity, failed to avoid conflicts of interest, failed to use due care and diligence in performing their duties, failed to maintain the accuracy of Company records and reports, failed to maintain internal controls failed to comply with applicable laws and regulations, and failed to report any of the foregoing violations of the Code of Conduct.

89.     Defendants Brown (Chair), Park, and Wong (collectively, the "Audit Committee Defendants") further violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial statements, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately discuss and review the information included in the Company's public announcements, failing to adequately review the Company's internal control policies and procedures, failing to adequately inquire of the Company's CEO and CFO as to the existence of any significant deficiencies or material weaknesses in the design or operation of internal controls, and failing to adequately discuss and review the Company's guidelines and policies concerning assessing and managing risk exposure as well as monitoring and controlling existing risks.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

90. Hyzon is a Delaware corporation based in Honeoye Falls, New York, that develops, markets, and sells hydrogen fuel cell powered commercial vehicles. Throughout the Relevant Period, the Individual Defendants' misrepresented, and/or caused Legacy Hyzon/the Company to misrepresent, Legacy Hyzon's/the Company's agreements with customers and Legacy Hyzon's/the Company's anticipated vehicle delivery timeline.

**False and Misleading Statements**

***February 9, 2021 Current Report, Joint Press Release, and Investor Presentation***

91. On February 9, 2021, DCRB filed a current report on Form 8-K with the SEC, signed by Defendant Haskopoulos, announcing the forthcoming Merger. Attached to the Form 8-K was a joint press release issued by Legacy Hyzon and DCRB highlighting the forthcoming Merger and certain aspects of Legacy Hyzon's business. The press release made false and misleading statements, and contained false and misleading statements attributed to Defendants Knight, Gu, and Tichio, stating, in relevant part:

- ***Proceeds to fully fund and accelerate Hyzon's well-defined growth strategy*** in the hydrogen fuel cell-powered, zero-emission commercial transportation sector

- Hyzon's technology already commercialized with existing global footprint, and ***sales pipeline with blue-chip Fortune 100s and municipalities***

\*　　　　\*　　　　\*

February 9, 2021, Rochester, NY & Menlo Park: Hydrogen mobility and clean energy company, Hyzon Motors Inc. ("Hyzon" or "the Company"), the industry-leading global supplier of zero-emissions hydrogen fuel cell powered commercial vehicles, and Decarbonization Plus Acquisition Corporation ("DCRB") (NASDAQ: DCRB) today announced a definitive agreement for a business combination that would result in Hyzon becoming a publicly listed company.

Hyzon, headquartered in Rochester, New York, is a differentiated, pure-play, independent mobility company with an exclusive focus on hydrogen in the commercial vehicle market. The Company's proven and proprietary hydrogen fuel

cell technology enables zero emission, fleet based, commercial transport at competitive performance as measured against both traditional fuel sources and other alternative vehicle power sources. Through its partnerships with market-leading suppliers and manufacturers, and the Company's commercial relationships with retailers, consumer goods companies, natural resource firms and governments, *Hyzon has rapidly expanded its commercial reach with supply agreements to customers around the world.* With a demonstrated technology advantage, leading fuel cell performance and a history of rapid innovation, Hyzon is catalyzing the adoption of hydrogen heavy vehicles.

"We are excited to partner with DCRB at an important inflection point for our company, hydrogen and society," said Craig Knight, Chief Executive Officer and Co-Founder of Hyzon.

"*Deliveries of Hyzon fuel cell powered heavy trucks to customers in Europe and North America will occur this year, well ahead of our competitors, and our committed sales pipeline is proof that the world is truly recognizing the need to develop innovative solutions to mitigate climate change and accelerate efforts to move the world economy down the path to net-zero emissions.*"

George Gu, Chairman and Co-Founder of Hyzon remarked, "*This business combination will enable us to expand deployments of our zero-emission hydrogen fuel cell powered heavy vehicles globally, and to continue leading the hydrogen transition.*

"We are incredibly excited about the dynamic mobility category *as municipalities and Fortune 100 companies are rapidly embracing hydrogen as the essential pathway to a net-zero economy.*

"The number of countries cementing and then enhancing their national hydrogen strategies expands almost weekly, and we are extremely encouraged by both investor and public interest in the hydrogen economy."

Robert Tichio, Chairman of the Board of DCRB and a Partner at Riverstone Holdings LLC, said, "We look forward to working with Craig and the entire team at Hyzon to advance the company's mission of Zero Emissions with Zero Compromise.

"As a differentiated, pure-play, hydrogen powered mobility company and an emerging leader in the trucking industry, Hyzon is a perfect match for DCRB's investment criteria and represents a further expansion of Riverstone's 15-year franchise in low-carbon investments.

"When forming this investment vehicle our objective was clear: to identify a truly exceptional company that is decarbonizing the global economy, *disrupting an*

*established industry with the commercialization of innovative technologies, and is well aligned with ESG principles. We found that company in Hyzon.*"

(Emphasis added.)

92.     Also attached to the February 9, 2021 Form 8-K was a presentation for investors prepared by Legacy Hyzon and DCRB highlighting some of Legacy Hyzon's purported customers, including Coca Cola, Heineken, and Ikea. Three relevant slides, each listing Coca Cola, Heineken, and Ikea as customers, are reproduced below:









93.     The statements identified in ¶¶ 91–92 above were false and misleading and failed

to disclose material facts necessary to render the statements made not false and misleading.

Specifically, the identified statements failed to disclose, *inter alia*, that: (1) many of the Legacy

Hyzon's, and later the Company's, touted partnerships with customers, including Coca Cola, Heineken, and Ikea, were nonexistent or overstated; and (2) Legacy Hyzon, and later the Company, would not be able to deliver vehicles in 2021, as Defendant Knight stated. As a result of the foregoing, Legacy Hyzon's and the Company's public statements concerning Legacy Hyzon's, and later the Company's, deals with customers, and Legacy Hyzon's, and later the Company's, anticipated production timelines were materially false and misleading at all relevant times.

### March 1, 2021 Annual Report and May 13, 2021 Amendment

94.     On March 1, 2021, DCRB filed its quarterly report with the SEC on Form 10-K for the fiscal year ended December 31, 2020 (the "2020 10-K"). The 2020 10-K was signed by each of the DCRB Defendants and contained certifications, signed by Defendants Anderson and Haskopoulos, pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the financial statements contained in the 2020 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

95.     The 2020 10-K further referred investors to "the Form 8-K filed with the SEC on February 9, 2021 for additional information" about the Merger. Thus, it redirected investors to the false and misleading statements, described above, attached to that document.

96.     On May 13, 2021, DCRB filed on Form 10-K/A with the SEC an amendment to the 2020 10-K (the "Amended 2020 10-K"). The Amended 2020 10-K was also signed by each of the DCRB Defendants, with the exception of Defendant Warren, and contained SOX certifications signed by Defendants Anderson and Haskopoulos attesting to the accuracy of the financial statements contained in the Amended 2020 10-K, the disclosure of any material changes to the

Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

97.     The Amended 2020 10-K also referred investors to "the Form 8-K filed with the SEC on February 9, 2021 for additional information" about the Merger. Thus, it redirected investors to the false and misleading statements, described above, attached to that document.

### May 24, 2021 Quarterly Report

98.     On May 24, 2021, DCRB filed its quarterly report for the fiscal quarter ended March 31, 2021 (the "1Q21 10-Q"). The 1Q21 10-Q was signed by Defendant Anderson and contained SOX certifications signed by Defendants Anderson and Haskopoulos attesting to the accuracy of the financial statements contained in the 1Q21 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

99.     The 1Q21 10-Q also referred investors to "the Form 8-K filed with the SEC on February 9, 2021 for additional information" about the Merger. Thus, it redirected investors to the false and misleading statements, described above, attached to that document.

100.     The statements identified in ¶¶ 94–99 above were false and misleading and failed to disclose material facts necessary to render the statements made not false and misleading. Specifically, the identified statements failed to disclose, *inter alia*, that: (1) many of the Legacy Hyzon's, and later the Company's, touted partnerships with customers, including Coca Cola, Heineken, and Ikea, were nonexistent or overstated; and (2) Legacy Hyzon, and later the Company, would not be able to deliver vehicles in 2021 as Defendant Knight stated. As a result of the foregoing, Legacy Hyzon's and the Company's public statements concerning Legacy Hyzon's,

and later the Company's, deals with customers, and Legacy Hyzon's, and later the Company's, anticipated production timelines were materially false and misleading at all relevant times.

### June 21, 2021 Proxy Statement

101.    On June 21, 2021, the Company filed the 2021 Proxy Statement with the SEC. Each of the DCRB Defendants, with the exception of Defendant Haskopoulos, solicited the 2021 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[2]

102.    The 2021 Proxy Statement called for Company shareholders to, *inter alia*: (1) approve the Merger; (2) approve certain amendments to the Company's Amended and Restated Certificate of Incorporation in connection with the Merger; (3) approve the issuance of up to, approximately, 243 million shares of Company common stock in connection with the Merger to comply with NASDAQ listing rules; (4) approve and adopt the New Hyzon 2021 Equity Incentive Plan (the "2021 Plan"); and (5) elect Defendants Anderson, Brown, Edwards, Gordon, Gu, Knight, Meng, Park, and Wong to the Company's post-Merger Board.

103.    The 2021 Proxy Statement stated the following about Legacy Hyzon's/the Company's expected delivery timeline and current customers:

> **Initial deliveries of Hyzon-branded commercial vehicles are expected this year.**
>
> *            *            *
>
> To date, Hyzon has received orders for Hyzon-branded commercial vehicles and coach buses in an aggregate value of approximately $18.2 million[1] from companies around the world, including Fortescue Metals Group Ltd., and Hyzon's counterparties have paid $1.8 million in deposits in respect of such orders. Hyzon

---

[2] Plaintiff's allegations with respect to the misleading statements in the 2021 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

also has an order valued at $1.47 million to integrate a hydrogen fuel cell system built around its next generation fuel cell stacks into aircraft, in respect of which Hyzon's counterparty has paid a deposit of $0.7 million. Hyzon's orders each include terms permitting the counterparty to cancel or suspend some or all of their obligations thereunder without cause, with little or no prior notice and without penalty or early termination payments. However, *Hyzon currently expects that these orders will be fulfilled and has determined that each a contract with a customer exists in accordance with ASC 606-10-25-1.* The transaction price associated with the subset of these contracts entered into prior to December 31, 2020 has accordingly been disclosed as a remaining performance obligation pursuant to ASC 606-10-50-13 through 50-15 (refer to Note 3: Revenues, within the Notes to Hyzon's Consolidated Financial Statements).

(Emphasis added; internal footnote omitted.)

104.    The 2021 Proxy Statement further stated that: "In Europe, Hyzon commenced assembling commercial vehicles in its Winschoten facility in February 2021, and *most current European and Australia/New Zealand commercial vehicle sales are expected to be fulfilled by the Winschoten facility, with first deliveries targeted for the second quarter of 2021.*" (Emphasis added.)

105.    The 2021 Proxy Statement failed to disclose that: (1) many of Legacy Hyzon's, and later the Company's, touted deals with customers were nonexistent or overstated; and (2) Legacy Hyzon, and later the Company, would not be able to deliver any vehicles in 2021 as claimed. As a result of the foregoing, the 2021 Proxy Statement was materially false and misleading at all relevant times.

106.    As a result of the material misstatements and omissions contained in the 2021 Proxy Statement, Company shareholders (1) approved the Merger; (2) approved certain amendments to the Company's Amended and Restated Certificate of Incorporation in connection with the Merger; (3) approved the issuance of up to, approximately, 243 million shares of Company common stock in connection with the Merger; (4) approved and adopted the 2021 Plan, under which many of the Individual Defendants could receive unjust compensation; and (5) elected Defendants Anderson,

Brown, Edwards, Gordon, Gu, Knight, Meng, Park, and Wong to the Company's post-Merger Board, allowing them to continue, or to begin, to breach their fiduciary duties to the Company.

### July 22, 2021 Current Report

107.    On July 22, 2021, Hyzon filed a current report with the SEC on Form 8-K. It was signed by Defendant Knight and announced that the Merger had closed on July 16, 2021. The July 22, 2021 Form 8-K incorporated the 2021 Proxy Statement, including the false and misleading statements contained therein, by reference.

### August 11, 2021 Press Release

108.    On August 11, 2021, Hyzon issued a press release announcing its financial results for the fiscal quarter ended June 30, 2021. The press release stated that "Hyzon reaffirms 2021 sales outlook, *including 85 vehicles to be shipped worldwide*[.]" (Emphasis added.)

### September 9, 2021 Press Release

109.    On September 9, 2021, the Company issued a press release announcing "Hyzon Motors to supply up to 500 hydrogen fuel cell electric vehicles to Shanghai logistics company[.] The press release stated, in relevant part:

> . . . *the initial order of 100 vehicles is expected before the end of 2021* while the other 400 vehicles will be ordered in 2022.
>
> HongYun Automobile focuses on providing logistics solutions primarily through hydrogen-powered fuel cell electric vehicles. *The company provides operation, leasing and maintenance service for customers across the country, including one of the world's largest steelmakers.* After Hyzon delivers the vehicles, HongYun will be responsible for the subsequent commercial arrangements with its end customers.
>
> "Hydrogen fuel cell technology has been adopted more quickly in China than in the rest of the world," said Hyzon CEO Craig Knight. "This allows Hyzon to begin the critical work of decarbonizing the environment, while building experience, capacity, and expertise which will be applied globally."

(Emphasis added.)

110.    The statements identified in ¶¶ 107–09 above were false and misleading and failed to disclose material facts necessary to render the statements made not false and misleading. Specifically, the identified statements failed to disclose, *inter alia*, that: (1) Hyzon's touted partnerships with customers were nonexistent or overstated; and (2) Hyzon would not be able to deliver vehicles in 2021. As a result of the foregoing, Hyzon's public statements about its deals with customers and its anticipated production timelines were materially false and misleading at all relevant times.

**The Truth Emerges**

111.    On September 28, 2021, *Blue Orca Capital* published the Blue Orca Report revealing the truth about the Company's purported deals and production timeline. The Blue Orca Report stated, in relevant part:

1.  **Hyzon's Largest Customer is a Fake-Looking Chinese Shell Entity Formed 3 Days Before Deal Announced**. We think Hyzon's largest customer looks fake. *On September 9, 2021, Hyzon's stock shot up 29% on a pre-market announcement that it secured a major new deal for 500 trucks (including 100 orders in 2021) from a new Chinese customer, Shanghai HongYun. Yet Chinese government records show that Shanghai HongYun was established only three days before Hyzon announced the deal and has no paid in capital. It has no WeChat account or website. The supposedly major customer appears to be just an empty shell entity. In our opinion, such evidence suggests that Hyzon announced a major order with a fake looking Chinese customer just to pump its stock price.*

2.  **Channel Checks Reveal Next Largest Customer Not Really a Customer**. *Hyzon claims that a New Zealand infrastructure startup named Hiringa supposedly signed an agreement to order 1,500 trucks by 2026, purportedly making it Hyzon's next largest customer. Yet when we channel checked these claims with Hiringa, its executive clarified that Hiringa was not actually a customer, but a "channel partner" assisting Hyzon in marketing vehicles to real end customers in New Zealand. Hiringa is a small startup operating out of a house in New Zealand which wants to raise money to build hydrogen fuel stations. Based on our conversation, Hiringa has neither the capability nor the current intention to purchase trucks from Hyzon. . . .*

3. **Phantom Big-Name Customers Suggest Overstated Orders and Financial Projections**. In its much hyped initial investor presentation filed in February 2021, *Hyzon generated considerable buzz around its SPAC by claiming that big household names -including Coca Cola, Ikea, and Heineken - were already "top tier customers" and "partners."* Yet in the following months, after other EV SPACs like Lordstown Motors got into trouble for fabricating customer contracts, *Hyzon quietly dropped these household names from its investor decks. In the four months between February 2021 and July 2021, nearly all of Hyzon's previously named blue chip customers disappeared from its disclosures altogether. In aggregate, Hyzon dropped customers supposedly accounting for $700 million in future orders from its subsequent decks.* Remarkably however, despite apparently losing many of its most prominent customers, Hyzon's financial projections remained unchanged. We think it's highly misleading for Hyzon to have apparently lost most of its blue-chip customers without substantially revising future revenue projections downward.

   - **Former Executives Left in Part Because of Concerns over Misrepresentations on Customer Contracts**. We spoke with one former senior executive who left the Company after only a few months. *He said he "didn't like the way [customer contracts] were being presented" and compared Hyzon "a bit like unfortunately what Nikola was doing… I was very uncomfortable with that."* In our opinion, such accounts corroborate the other evidence showing that *Hyzon is likely overstating customer relationships or misrepresenting its contracts.*

   \*             \*             \*

6. **Two CTO Resignations in 15 Months**. Hyzon is a zero revenue SPAC whose stock price is contingent on the value of its yet undeveloped vehicle technology to generate future revenues. Yet *two of Hyzon's CTOs have resigned in the past 15 months, even though Hyzon was only formed 20 months ago.* The first CTO resigned after just five months at Hyzon. The second, Gary Robb, just resigned (September 2021). If Hyzon's technology is supposedly world class, and the foundation for its hockey stick like future revenue growth, we question why the critical officers in charge of such technology apparently have such little faith in either the Company or the technology (or both) that they stepped down, despite the obvious financial incentives to remain at the SPAC.

Ultimately, we think *Hyzon's parent has taken advantage of the general suspension of disbelief in financial markets to enrich insiders by repackaging an old technology in a fig leaf of misleading deal announcements and illusory customer contracts. In our opinion, it is akin to a Chinese Lordstown Motors.*

(Some original emphasis removed. Italicized emphasis added.)

112.    In a second enumerated list, the Blue Orca Report stated, in relevant part:

**1. Hyzon's Largest Customer is a Fake-Looking Chinese Shell Entity Formed 3 Days Before Deal Announced.**

***We think Hyzon's largest customer looks fake.*** On September 9, 2021, Hyzon's stock shot up 29% largely on the strength of a pre-market announcement by the Company that it had secured a major new vehicle deal.

Hyzon announced that it had signed a Memorandum of Understanding ("MoU") with a new Chinese customer, Shanghai Hydrogen HongYun Automotive Co., Ltd. ("Shanghai HongYun"), for the sale of 500 trucks. ***In the announcement, Hyzon claimed that the customer expects to order 100 of these trucks in 2021, with the remaining 400 trucks to be ordered in 2022. This makes Shanghai HongYun by far one of Hyzon's largest near-term customers.***

[Image omitted.]

***To put the size of the order in context, the 100-truck-order supposedly placed in 2021 is larger than the Company's previously guided total deliveries for the year.*** The market duly reacted, causing Hyzon's stock to rip as high as 29% on the day.

***If authentic, Hyzon's deal with Shanghai HongYun is worth as much as $250 million. For a commitment of that size, we would typically expect the counterparty to be a deep-pocketed and well-established logistics company*** with sufficient operating footprint, infrastructure and track record to purchase and deploy 500 new hydrogen fueled trucks.

But when we looked up Shanghai HongYun on China's National Enterprise Credit Information Publicity System, we found that ***Shanghai HongYun was established only three days before Hyzon announced the deal.***

[Image omitted.]

The Chinese corporate registry also shows that ***Shanghai Hong Yun has no paid in capital.***

[Image omitted.]

With no paid in capital, ***the customer appears to be merely an empty shell company. Shanghai HongYun does not yet have an official phone number, email, WeChat or website that we could find.***

[Image omitted.]

Hyzon cannot claim that HongYun is the subsidiary of a larger corporation because its two sole shareholders are individuals.

*           *           *

***In our opinion, such evidence suggests that Hyzon announced a bogus deal with a fake looking Chinese customer to pump its stock price.***

## 2. Channel Checks Reveal Next Largest Customer Not Really a Customer; Significant 2021 Delivery and Guidance Miss

***Hyzon's next largest customer is a tiny New Zealand startup who told us they are not really a customer***. Based on our conversation, we do not think that Hiringa has the obligation, the intention, or the capability to purchase the trucks Hyzon claimed in its announcement.

Hiringa has long been a key customer in Hyzon's SPAC narrative. At the height of SPAC mania in February 2021, Hyzon announced that it had signed an agreement to build and supply 1,500 hydrogen powered vehicles for Hiringa, with the first batch of 20 trucks "expected to enter service" in 2021.

[Image omitted.]

Hyzon also highlighted the Hiringa contract in a YouTube promotional video by its CEO Craig Knight in March 2021.

[Image and link omitted.]

To channel check Hyzon's claims, we spoke with a senior Hiringa executive. Although they remain interested in the project, ***Hiringa explained to us that they are not actually a customer, but a "channel partner" for Hyzon's vehicles. Hiringa does not intend to pay for or take title over the trucks, but merely facilitate the sale of hydrogen trucks to third parties.***

> "We're effectively a channel partner model if you like."

> "***Our business model is not to buy the trucks. We do the refueling***…. we're effectively an unpaid market channel"

> "There's no point in us being the middleman. So [end customer] will physically pay for the trucks and they will physically take title."

> - Hiringa Executive

*           *           *

This makes more sense, as **Hiringa does not have anywhere near the financial resources to pay for 1,500 trucks**, being a company with less than 20 employees according to LinkedIn and supposedly operating out of a house in New Zealand. **Rather than purchasing 1,500 trucks, Hiringa plans to build fuel stations with the hope of facilitating future purchases from end customers.**

**Hiringa also informed us that the 1,500-truck agreement claimed by Hyzon in its investor presentations is not a binding order, and that it merely represents a right, not an obligation, to buy.**

> "That's a right to buy, not an obligation to buy."

> "At the end of the day it's not binding. That's not a binding purchase. It's a purchasing framework."

> - Hiringa Executive

\*     \*     \*

**In its [July 2021] investor presentation, Hyzon insisted that these 2021 orders are "100% certain." Not probable, but "100% certain."**

\*     \*     \*

### 3. Phantom Big-Name Customers Suggest Overstated Orders and Financial Projections

In its much hyped initial investor presentation filed in February 2021, **Hyzon generated considerable buzz around its SPAC with a deck that included a number of big household names listed as "top tier customers," including Coca Cola, Nestle, Ikea, and Heineken.**

[Image omitted.]

For example, **the February deck showed that Hyzon was finalizing purchase orders with the likes of Heineken and Ikea for vehicles to be delivered in 2021. Hyzon also projected hundreds of millions in revenues from Coca-Cola in the next five years.**



Source: *Hyzon Investor Presentation February 2021*

These names generated considerable enthusiasm, and Hyzon's stock price predictably exploded with investor interest. Yet like many other rotten EV SPACs (e.g. Lordstown Motors), these name brand customer relationships appear to have been largely illusory.

Two months later, Hyzon's April investor presentation showed a very different customer list with most of the notable name brands missing.

Spot the difference:




Source: *Hyzon February 2021 Investor Presentation*, *Hyzon April 2021 Investor Presentation*

Coca Cola. Gone. Heineken. Gone. Ikea. Gone.

***In the four months between February 2021 and July 2021, nearly all of Hyzon's previously named blue chip customers disappeared*** from its disclosures altogether. . . .

In total, ***Hyzon dropped blue chip customers with orders worth $700 million in future orders from its subsequent investor presentations.***

[Image omitted.]

Hyzon achieved early credibility in a crowded field of zero revenue EV SPACs in part by promoting orders from name brand customers, yet without a word it has dropped almost all of these supposed customers from mention in its subsequent investor presentations. . . .

Between the top of SPAC mania in February and the lukewarm market conditions in July, multiple EV SPACs were exposed for faking customer orders, exaggerating their backlog and exaggerating future revenues, including XL Fleet, Nikola, and Lordstown Motors. . . .

\*           \*           \*

•     Former Executives Left in Part Because of Concerns over Misrepresentations on Customer Contracts.

Hyzon's apparent misrepresentation of its key customers at the time of its SPAC is consistent with the comments of one of its former senior executives with whom we spoke. ***The former executive indicated that he and other early senior Hyzon executives, all of whom left the Company, became uncomfortable with how Hyzon was presenting customer orders to investors.***

"I just didn't like the way it was being presented. A lot of the stuff that they are saying is open to interpretation how you read that. ***Saying that they've got all of these orders and things. But a lot of them are all MoUs which as you know in the business mean basically nothing.***

***They were going out, kind of selling it as really what it wasn't at the time. A bit like unfortunately what Nikola was doing.*** It's kind of a lot of hype, and getting money through that hype from people who don't really understand

You know it's great to show all these pictures of renderings of trucks and orders that you may have, but ***these orders, most of them… 90% of them are MoUs so there's no binding contract, and if you look from when they've announced those [contracts], still none of those have been built or delivered.***

***The only three vehicles they have is what's on their website. These are all prototype vehicles. They're not production vehicles of any type.*** They've basically been hand built at the facilities. These are the things that I think, if you're going to announce that, say that. Be honest about it.

I was very uncomfortable with that. A lot of these, if you look at their website, they've loaded lots of them on there of signed meetings they had. ***All these are MoUs that they've signed. None of them are binding in any way whatsoever.***"

- Former Senior Hyzon Executive

. . . In our opinion, Hyzon was either initially misleading the market or it lost these orders between February and July. Either way, we cannot see a scenario in which Hyzon's revenue projections could remain unchanged.

(Emphasis altered from original; internal footnotes removed.)

113.     The Blue Orca Report further disclosed the following regarding Hyzon's supposed delivery timeline:

•     ***Significant 2021 Delivery and Guidance Miss. According to Hyzon, Hiringa will account for 24% of the Company's projected deliveries in 2021. Yet***

***Hiringa stated point blank that no deliveries would be taken in 2021,*** and the first validation trucks would be delivered for testing in March or April 2022, at the earliest. Hiringa supposedly accounts for 24% of Hyzon's projected 2021 deliveries, so we expect a major guidance miss. ***We think it is highly misleading for Hyzon to continually reaffirm delivery and revenue guidance and characterize such revenues as "100% certain" when Hiringa admits that it will not take any deliveries this year.***

*          *          *

As we will discuss in the next section, interviews with other purported customers indicate that ***Hyzon is far behind its vehicle delivery claims*** to investors and will likely miss guidance both in 2021 and going forward by a wide margin. We suspect that given these and other setbacks, Hyzon was desperate.

*          *          *

•   ***Significant 2021 Delivery and Guidance Miss***

Furthermore, Hiringa directly contradicted Hyzon's claims regarding its near-term deliveries.

***When Hyzon announced the Hiringa contract, it stated that it expected to deliver the first 20 trucks by the end of 2021***, accounting for 24% of its guided deliveries in the year. ***As recently as August, Hyzon reaffirmed this guidance***, projecting 85 truck deliveries and $37 million in revenues in 2021.

*          *          *

Yet Hiringa's executive said that ***Hiringa will not take any deliveries of Hyzon trucks in 2021 and expects to receive the first four validation vehicles in March or April 2022, at the earliest.***

Hiringa: "Realistically with the supply chains, ***I think they will be arriving in March or April [2022].*** There's also some work to do in quarter one in the Netherlands before they ship."

Blue Orca: "***So you don't actually expect trucks this year?*** You expect them in the first quarter of 2022?"

Hiringa: "…***March through May, if you like, or April through June [2022]*** is when we are going to be doing validation in New Zealand… it's not [a] full commercial operation."

Blue Orca: "***So you don't expect any trucks to be delivered from Hyzon until at least March or April next year. And those are the four validation units?***"

50

Hiringa: "***Yep, yep.***"

- Hiringa Executive

***This directly contradicts Hyzon's claims to investors.*** According to Hyzon's disclosures, Hiringa will account for 24% of the Company's deliveries in 2021, making it the key to whether Hyzon meets its revenue and delivery guidance for this year. ***But Hiringa told us point blank that no deliveries would be taken in 2021***, and the first validation trucks would be delivered in *March or April 2022*, at the earliest.

Furthermore, Hiringa told us that the remaining 16 trucks ordered from Hyzon would be fulfilled based on testing results of the initial four validation vehicles, which they expect to carry out between March and June 2022 at the earliest.

We asked Hiringa if there was any possibility that they might bring forward the order for the 16 trucks, but Hiringa told us that they do not want to take delivery until they build the commercial hydrogen fuel station infrastructure in New Zealand – which Hiringa indicated would not be until the second half of 2022.

"We don't have the [commercial] stations until the second half of the [2022] calendar year. So, we don't want to hold [on to] 16 trucks…"

- Hiringa Executive

***Our call with Hiringa suggests that the 1,500-truck deal was more hype than reality.*** Based on our conversation, we do not think that Hiringa has the obligation, the intention, or the capability to purchase the trucks Hyzon claimed in its announcement.

Ultimately, we think Hyzon continues to mislead investors by reaffirming 2021 guidance when its purportedly major customer is not actually a customer and states point blank that they will not be taking any vehicle deliveries this year.

(Emphasis altered from original.)

114.    On this news, the Company's share price declined by $2.58 per share—over 28%—from its February 27, 2021 closing price of $9.21 per share to close February 28, 2021 at $6.63.

## DAMAGES TO HYZON

115.    As a direct and proximate result of the Individual Defendants' misconduct, Hyzon has lost and will continue to lose and expend many millions of dollars.

116.    Such expenditures include, but are not limited to, the fees associated with the Securities Class Action filed against the Company and the Company's CEO and CFO, DCRB's former CEO and CFO, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

117.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company, including any unjust compensation paid to the Individual Defendants in connection with the closing of the Merger or under the 2021 Plan.

118.    As a direct and proximate result of the Individual Defendants' conduct, Hyzon has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## **DERIVATIVE ALLEGATIONS**

119.    Plaintiff brings this action derivatively and for the benefit of Hyzon to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of the Company, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, the aiding and abetting thereof, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

120.    Hyzon is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

121.    Plaintiff is, and has been at all relevant times, a shareholder of the Company. Plaintiff will adequately and fairly represent the interests of Hyzon in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

122.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

123.    A pre-suit demand on the Board of Hyzon is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine individuals: Defendants Anderson, Brown, Edwards, Gordon, Gu, Knight, Meng, Park, and Wong (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to five of nine Directors who are on the Board at the time this action is commenced.

124.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

125.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in the foregoing scheme. The fraudulent scheme were intended to make the Company appear more profitable and attractive to investors. Moreover, the Directors caused the Company to fail to maintain internal controls. As a result of the foregoing, the Directors breached

their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

126.    Demand is also excused as to the Directors because they were each elected pursuant to the 2021 Proxy Statement, which contained false and misleading statements and omissions of material fact and was solicited by certain of the DCRB Defendants. Moreover, the 2021 Proxy Statement asked shareholders to approve certain aspects of the Directors' compensation, through approving the 2021 Plan. Moreover, the 2021 Proxy Statement asked shareholders to approve the Merger, which certain of the Directors were interested in, including without limitation Defendants Anderson, Edwards, Gu, Knight, Meng, and Wong. Thus, the Directors each directly benefitted from the misconduct at issue, including certain of the DCRB Defendants' misconduct in issuing the false and misleading 2021 Proxy Statement. The Directors' financial rewards stemming from this misconduct preclude them from acting independently and disinterestedly. The Directors are therefore unable to impartially consider a demand against themselves and the other Individual Defendants based on these circumstances.

127.    Additional reasons that demand on Defendant Anderson is futile follow. Defendant Anderson served as DCRB's CEO from September 2020 until the Merger and as director of DCRB from October 2020 until the Merger. He has served as a director at Hyzon since the Merger and is Chair of the Compensation Committee. Due to his recent tenure as CEO of DCRB, he is a non-independent director. The Company provides Defendant Anderson with handsome compensation, including compensation paid under the 2021 Plan which was adopted in part due to the false and misleading statements for which some of Individual Defendants are responsible. As CEO of DCRB, Defendant Anderson was ultimately responsible for all of the false and misleading statements and omissions that were made by the Company prior to the Merger, including the

statements contained in the 2020 10-K, Amended 2020 10-K, and 1Q21 10-Q, each of which he personally signed and signed SOX certifications for. In addition, the 2021 Proxy Statement was solicited on his behalf, and the false and misleading statements contained therein contributed to his election to the Board. As the Company's highest officer, prior to the Merger, and as a trusted Company director, both before and after the Merger, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Anderson is a defendant in the Securities Class Action. For these reasons, Defendant Anderson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

128.   Additional reasons that demand on Defendant Knight is futile follow. Defendant Knight has served as the Company's CEO and as a director since the Merger. Prior to the Merger, he was CEO of Legacy Hyzon since August 2020, and prior to that he was Chief Commercial Officer at Legacy Hyzon, since he cofounded Legacy Hyzon in January 2020. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Knight with his principal occupation for which he receives handsome compensation, including compensation paid under the 2021 Plan which was adopted in part due to the false and misleading statements for which some of the Individual Defendants are responsible. As CEO of Legacy Hyzon and later the Company, Defendant Knight bears personal responsibility for many of the false and misleading statements and omissions that were made during the Relevant Period, including those statements he personally made in the pre-Merger press release and those statements made by the Company after the Merger, including in the July 22, 2021 Form 8-K which he signed. In addition, the false

and misleading statements contained in the 2021 Proxy Statement contributed to his election to the Board. As one of the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Knight is a defendant in the Securities Class Action. For these reasons, Defendant Knight breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

129.    Additional reasons that demand on Defendant Gordon is futile follow. Defendant Gordon has served as CFO and a Company director since the Merger. Prior to this, he was CFO at Legacy Hyzon since August 2020. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Gordon with his principal occupation for which he receives handsome compensation, including compensation paid under the 2021 Plan which was adopted in part due to the false and misleading statements for which some of the Individual Defendants are responsible. Moreover, the false and misleading statements contained in the 2021 Proxy Statement contributed to his election to the Board. As CFO and a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Gordon is a defendant in the Securities Class Action. For these reasons, Defendant Gordon breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

130.    Additional reasons that demand on Defendant Gu is futile follow. Defendant Gu has served as the Company's Executive Chairman since the Merger. Prior to the Merger, he was Executive Chairman of Legacy Hyzon since August 2020, and prior to that he was CEO at Legacy Hyzon, since he cofounded Legacy Hyzon in January 2020. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Gu with his principal occupation for which he receives handsome compensation, including compensation paid under the 2021 Plan which was adopted in part due to the false and misleading statements for which some of the Individual Defendants are responsible. As Executive Chairman of Legacy Hyzon and later the Company, Defendant Gu bears personal responsibility for many of the false and misleading statements and omissions that were made during the Relevant Period, including those statements he personally made in the pre-Merger press release and those statements made by the Company after the Merger. In addition, the false and misleading statements contained in the 2021 Proxy Statement contributed to his election to the Board. As one of the Company's highest officers as trusted Executive Chairman, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Gu breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

131.    Additional reasons that demand on Defendant Brown is futile follow. Defendant Brown has served as a Company director since the Merger. She also serves as the Chair of the Audit Committee. As a Company director, she receives compensation from the Company, including compensation paid under the 2021 Plan which was adopted in part due to the false and

misleading statements for which some of the Individual Defendants are responsible. The false and misleading statements contained in the 2021 Proxy Statement also contributed to her election to the Board. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Brown breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

132.    Additional reasons that demand on Defendant Edwards is futile follow. Defendant Edwards has served as a Company director since the Merger. He also serves as a member of both the Compensation Committee and the Nominating and Corporate Governance Committee. As a Company director, he receives compensation from the Company, including compensation paid under the 2021 Plan which was adopted in part due to the false and misleading statements for which some of the Individual Defendants are responsible. The false and misleading statements contained in the 2021 Proxy Statement also contributed to his election to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Edwards breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

133.    Additional reasons that demand on Defendant Meng is futile follow. Defendant Meng has served as a Company director since the Merger. Prior to the Merger, he was a director

of Legacy Hyzon since August 2020. He also serves as a member of both the Compensation Committee and the Nominating and Corporate Governance Committee. As a Company director, he receives compensation from the Company, including compensation paid under the 2021 Plan which was adopted in part due to the false and misleading statements for which some of the Individual Defendants are responsible. The false and misleading statements contained in the 2021 Proxy Statement also contributed to his election to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Meng breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

134.    Additional reasons that demand on Defendant Park is futile follow. Defendant Park has served as a Company director since the Merger. He also serves as a member of the Audit Committee. As a Company director, he receives compensation from the Company, including compensation paid under the 2021 Plan which was adopted in part due to the false and misleading statements for which some of the Individual Defendants are responsible. The false and misleading statements contained in the 2021 Proxy Statement also contributed to his election to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Park breached his fiduciary duties,

faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

135.     Additional reasons that demand on Defendant Wong is futile follow. Defendant Wong has served as a Company director since the Merger. She also serves as Lead Independent Director, Chair of the Nominating and Corporate Governance Committee, and as a member of the Audit Committee. As a Company director, she receives compensation from the Company, including compensation paid under the 2021 Plan which was adopted in part due to the false and misleading statements for which some of the Individual Defendants are responsible. The false and misleading statements contained in the 2021 Proxy Statement also contributed to her election to the Board. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Wong breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

136.     Additional reasons that demand on the Board is futile follow.

137.     Demand is excused because the Directors are beholden to and controlled by Horizon, the Company's majority shareholder with approximately 63% of the Company's outstanding common stock as of July 16, 2021. Directors Knight and Gu own, 2.4% and 17.6%, respectively, of Horizon. Moreover, Defendant Knight worked at Horizon from August 2006 until August 2020, including for almost a year as CEO, and is a managing director at Hymas, a Horizon affiliate. Further still, Defendant Gu cofounded Horizon in 2003, served as its CEO from its founding until August 2020, and has been its Chairman since August 2019. Defendant Meng, too,

is an affiliate of Horizon, given that his primary employer, Bscope Ltd., holds share of Horizon through an investment vehicle. In light of Horizon's control over the composition of the Board as majority shareholder, and in light of Defendant Knight's and Defendant Gu's longstanding, close, and ongoing relationship with Horizon (as well as Defendant Meng's affiliation with Horizon) the Board cannot independently and disinterestedly investigate the wrongdoing alleged herein—and in particular the wrongdoing of Defendants Gu and Knight, both of whom are primary wrongdoers who personally made false and misleading statements. Thus, because none of Directors are able to evaluate a demand with the requisite disinterestedness or independence, demand is futile as to them.

138.    In addition to the above, the Directors have other longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, Defendants Gu and Knight cofounded Legacy Hyzon and each is unable to disinterestedly and independently consider a litigation demand against the other. Likewise, Defendants Gordon and Meng have prior experience working together with Defendants Gu and Knight at Legacy Hyzon. In addition, Defendant Anderson worked very closely with the other DCRB Defendants for almost a year prior to the Merger in finding and then merging with a target company, and thus is unable to disinterestedly and independently consider a litigation demand against them. In particular, Defendant Anderson would be unable to consider a litigation demand disinterestedly and independently against Defendants Lapeyre and Leuschen, who shared voting and investment discretion over the SPAC Sponsor, as cofounders and senior managing directors of Riverstone. These conflicts of interest precluded the Directors from adequately monitoring the Company's

operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Directors would be futile.

139.    Demand is also futile against the Audit Committee Defendants—i.e., Defendants Brown, Park, and Wong—who served as members of the Audit Committee at the Company during part of the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for, *inter alia*, overseeing the accounting and financial reporting processes of the Company and reviewing and taking steps to remedy any deficiencies with the Company's system of internal controls. As discussed above, the Audit Committee Defendants violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial statements, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately discuss and review the information included in the Company's public announcements, failing to adequately review the Company's internal control policies and procedures, failing to adequately inquire of the Company's CEO and CFO as to the existence of any significant deficiencies or material weaknesses in the design or operation of internal controls, and failing to adequately discuss and review the Company's guidelines and policies concerning assessing and managing risk exposure as well as monitoring and controlling existing risks. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

140.    In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. In further

violation of the Code of Conduct, the Directors failed to act with honesty and integrity, failed to avoid conflicts of interest, failed to use due care and diligence in performing their duties, failed to maintain the accuracy of Company records and reports, failed to maintain internal controls failed to comply with applicable laws and regulations, and failed to report any of the foregoing violations of the Code of Conduct.

141.    Hyzon has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Individual Defendants or any others who were responsible for that wrongful conduct to attempt to recover for Hyzon any part of the damages Hyzon suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

142.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As all of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

143.    The acts complained of herein constitute violations of fiduciary duties owed by the Company's officers and directors, and these acts are incapable of ratification.

144.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e.,

monies belonging to Company stockholders. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Hyzon, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

145.    If there is no directors' and officers' liability insurance, then the Directors will not cause Hyzon to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

146.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with the requisite disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Defendants Anderson, Aaker, Kearns, Lapeyre, Leuschen, McDermott, Tepper, Tichio, and Warren for Violations of Section 14(a) of the Exchange Act

147.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

148.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public

interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

149.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

150.    Under the direction and watch of Defendants Anderson, Aaker, Kearns, Lapeyre, Leuschen, McDermott, Tepper, Tichio, and Warren, the 2021 Proxy Statement failed to disclose that: that: (1) many of Legacy Hyzon's, and later the Company's, touted deals with customers were nonexistent or overstated; and (2) Legacy Hyzon, and later the Company, would not be able to deliver any vehicles in 2021 as claimed. As a result of the foregoing, the 2021 Proxy Statement was materially false and misleading. In the exercise of reasonable care, Defendants Anderson, Aaker, Kearns, Lapeyre, Leuschen, McDermott, Tepper, Tichio, and Warren should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2021 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2021 Proxy Statement, including but not limited to, the approval of the Merger, the approval of the 2021 Plan, and the election of the Directors to the Board.

151.    The false and misleading elements of the 2021 Proxy Statement led to, among other things, the election of the Directors, which allowed them to continue to, or begin to, breach their fiduciary duties to the Company. The false and misleading elements of the 2021 Proxy Statement

also led the Company's shareholders to approve amendments to the 2021 Plan, allowing certain of the Directors to receive more unjust compensation.

152.    The Company was damaged as a result of Defendants Anderson, Aaker, Kearns, Lapeyre, Leuschen, McDermott, Tepper, Tichio, and Warren's material misrepresentations and omissions in the 2021 Proxy Statement.

153.    Plaintiff, on behalf of Hyzon, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

154.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

155.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of the Company's business and affairs.

156.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

157.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of the Company.

158.    In breach of their fiduciary duties owed to the Company, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) many of Legacy Hyzon's, and later the Company's, touted deals with customers were nonexistent or overstated; and (2) Legacy Hyzon, and later the Company, would not be able to deliver any

vehicles in 2021 as claimed. As a result of the foregoing, the Company's public statements touting its customer partnerships and expected delivery timeline were materially false and misleading at all relevant times.

159.    The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

160.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

161.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

162.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

163.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Hyzon has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

164.    Plaintiff on behalf of Hyzon has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Unjust Enrichment

165.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

166.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

167.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance or artificially inflated valuation of the Company, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes compensation received in connection with the closing of the Merger and under the 2021 Plan, both of which certain Individual Defendants induced the Company's shareholders to approve through false and misleading representations.

168.    Plaintiff, as a shareholder and a representative of Hyzon, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

169.    Plaintiff on behalf of Hyzon has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Abuse of Control

170.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

171.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

172.     As a direct and proximate result of the Individual Defendants' abuse of control, Hyzon has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

173.     Plaintiff on behalf of Hyzon has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

174.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

175.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly-held corporation.

176.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Hyzon has sustained and will continue to sustain significant damages.

177.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

178.     Plaintiff on behalf of Hyzon has no adequate remedy at law.

## SIXTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

179.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

180.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

181.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Hyzon to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

182.    As a result of the waste of corporate assets, the Individual Defendants and are each liable to the Company.

183.    Plaintiff on behalf of Hyzon has no adequate remedy at law.

## SEVENTH CLAIM

### Against Defendants Anderson, Haskopoulos, Knight, and Gordon for Contribution Under Sections 10(b) and 21D of the Exchange Act

184.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

185.    Hyzon, and Defendants Anderson, Haskopoulos, Knight, and Gordon, are named as defendants in the Securities Class Action, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to

Defendants Anderson's, Haskopoulos's, Knight's, and Gordon's willful and/or reckless violations of their obligations as officers and/or director of Hyzon.

186.    Defendants Anderson, Haskopoulos, Knight, and Gordon, because of their positions of control and authority as CEO and CFO of DCRB and CEO and CFO of Hyzon, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

187.    Accordingly, Defendants Anderson, Haskopoulos, Knight, and Gordon are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

188.    As such, Hyzon is entitled to receive all appropriate contribution or indemnification from Defendants Anderson, Haskopoulos, Knight, and Gordon.

## EIGHTH CLAIM

### Against the Legacy Hyzon Defendants for Aiding and Abetting
### Breach of Fiduciary Duty

189.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

190.    The Legacy Hyzon Defendants aided and abetted the DCRB Defendants who breached their fiduciary duty to the Company.

191.    The Legacy Hyzon Defendants' misconduct resulted in continuous, connected, and ongoing harm to the Company.

192.    Specifically, the Legacy Hyzon Defendants promoted the Merger by issuing false and misleading statements concerning Legacy Hyzon's operations and business prospects, and in

particular Legacy Hyzon's agreements with purported customers and vehicle delivery timeline. Moreover, the Legacy Hyzon Defendants controlled and operated Legacy Hyzon, Hyzon's functional and operational predecessor, and caused Legacy Hyzon to jointly issue press releases and file SEC filings which contained materially false and misleading statements promoting Hyzon's future operations and prospects.

193.    The Legacy Hyzon Defendants are jointly and severally liable to the same extent as the DCRB Defendants are liable for breaches of fiduciary duty as set forth herein or violations of any other laws.

194.    As a direct and proximate result of the Legacy Hyzon Defendants' aiding and abetting of the DCRB Defendants' breaches of duty alleged herein, Hyzon has sustained and will continue to sustain substantial damages.

195.    Plaintiff on behalf of Hyzon has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Hyzon, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Hyzon;

(c)    Determining and awarding to Hyzon the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Hyzon and the Individual Defendants to take all necessary actions

to reform and improve Hyzon's corporate governance and internal procedures to comply with applicable laws and to protect Hyzon and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Hyzon to nominate at least five candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding Hyzon restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: December 16, 2021                    Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**
*/s/ Timothy Brown*

Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

*Counsel for Plaintiff*

## **VERIFICATION**

I, Brian Lee am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _____, 2021.

12/13/2021

Brian Lee
_____
Brian Lee